```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TERRENCE MOORE, as Trustee of
the Metal Lathers Local 46
Pension Fund, et al.,

          Plaintiffs,

     v.                              14 Civ. 8326 (CM) (JLC)

NAVILLUS TILE, INC., et al.,

          Defendants.

------------------------------x
                                          New York, N.Y.
                                          March 3, 2015
                                          3:00 p.m.

Before:

               HON. JAMES L. COTT,

                         District Judge

                    APPEARANCES

KENNEDY, JENNIK & MURRAY
     Attorneys for Plaintiffs
BY:  SERGE AMBROISE

JONES DAY
     Attorneys for Defendants Navillus Tile, D. O'Sullivan and
H. O'Sullivan
BY:  JOSHUA GROSSMAN
```

F335mooC

1             (Case called)
2             THE DEPUTY CLERK:  Counsel, state your name for the
3    record.
4             MR. AMBROISE:  Serge Ambroise, Kennedy, Jennik &
5    Murray, counsel to plaintiffs Terrence Moore, et al.
6             THE COURT:  Good afternoon, Mr. Ambroise.
7             MR. KAMIEN:  Kalvin Kamien, Greenberg, Trager &
8    Herbert, counsel for nonparty JDS Construction Group, LLC.
9             THE COURT:  Good afternoon, Mr. Kamien.
10            MR. CONTOS:  Contos con, I represent.
11            MR. GROSSMAN:  Joshua Grossman, Jones Day.  I
12   represent defendants Navillus Tile, Helen O'Sullivan and Donal
13   O'Sullivan.
14            THE COURT:  Mr. Grossman.
15            So, why don't we talk first about the application as
16   it pertains to Mr. Kamien's client.  And I see that we wrote a
17   letter back and said I expected him to be here.  Other counsel
18   may sit.
19            The question, Mr. Ambroise, is why are you resistant
20   to providing a 502(d) order and then the question I am going to
21   ask you, Mr. Kamien, is why didn't you ask for a 502(d) order
22   with respect to this client at the same time you secured one
23   with respect to another client in this same litigation?
24            Those are my two questions.  So, Mr. Ambroise?
25            you can be seated, Mr. Kamien, for now.

1         MR. AMBROISE:  Yes, your Honor.  Thank you.

2         Our concern about the late request for a 502(d) order
3    comes from the fact that we have subpoenaed a number of
4    contractors with subpoenas identical to the ones that were
5    provided to JDS and the other party, Washington Square, and to
6    date JDS is the only contractor who has provided us with
7    absolutely nothing in response to subpoena.  We are concerned
8    about further delay as we are two months away from the date of
9    the service of the subpoena.  And I actually offered the 502(d)
10   order as a solution early on right after the conference here
11   before your Honor regarding two other third-parties.  Soon
12   thereafter I presented that idea to counsel for JDS and said
13   that plaintiffs were in favor of securing such an order in
14   order to expedite the process.  During the telephone call on
15   January 28th, again it was discussed and it was agreed upon
16   with respect to one of the represented parties, as you have
17   seen in my papers.  We are just concerned about further delay.

18        THE COURT:  Let me talk to Mr. Kamien about how
19   quickly he can produce whatever it is his client has with a
20   502(d) order.

21        How quickly can you do so?

22        MR. KAMIEN:  As I stated in my e-mail back on February
23   13th, to Mr. Ambroise, we are prepared to produce any -- just
24   so it is clear, most of the project documents have already been
25   produced in this case by the defendants.  What was turned over

Case 1:14-cv-08326-CM-JLC   Document 83   Filed 03/16/15   Page 4 of 18    4
F335mooC


1    to us was the production that was made by the defendants, ACS,
2    and the other defendants, which pretty well covered everything.
3             THE COURT:  He wants what you have that they haven't
4    produced.
5             MR. KAMIEN:  Yes.
6             THE COURT:  How quickly can you produce that?
7             MR. KAMIEN:  We can produce it within one week of when
8    we receive the 502(d) order which is exactly what we offered
9    back on February 13th.
10            THE COURT:  Well, if there is a 502(d) order in place
11   as of tomorrow then you would produce it no later than a week
12   from tomorrow, meaning March 11th?
13            MR. KAMIEN:  Yes.
14            THE COURT:  Mr. Ambroise, why isn't that what we
15   should do here?
16            MR. AMBROISE:  I'm sorry, your Honor?  Again, please?
17            THE COURT:  You are going to submit an order, just
18   like the previous ones, I am going to sign it tomorrow and
19   Mr. Kamien's client is going to make their further production
20   or their production, I should say, to you, by March 11th, in
21   one week.  Okay?
22            MR. AMBROISE:  Okay.
23            THE COURT:  So ordered.
24            Now I don't have a letter from you, Mr. Contos, so
25   tell me what the issues are with respect to your client.

1          MR. CONTOS:  Your Honor, on January 20th, Bravo
2     provided its entire project file to plaintiffs.  The additional
3     documents they are seeking now are e-mails.  Bravo feels it
4     would be an undue burden to have to search -- there are
5     thousands of e-mails relating to this project.
6          THE COURT:  Can they be married by search terms and
7     custodians?
8          MR. CONTOS:  The search terms Mr. Ambroise has
9     requested are producing a vast number of results and Bravo will
10    have to have their attorneys review these documents.  There is
11    sensitive commercial information in there that Bravo would like
12    to keep confidential.  And, in terms of time or expense, we
13    have only -- Bravo's only worked with one of the defendants,
14    ACS, and it was just on one project.
15         THE COURT:  East End Avenue, that's what the subpoena
16    is narrowed to have been focused on, as I understand it.
17         MR. CONTOS:  In terms of the claim at issue in this
18    case, we don't think our e-mails are going to produce anything
19    relevant.
20         THE COURT:  Well, that is not for you to decide, I
21    don't think.  That's for Judge McMahon to decide on summary
22    judgment or trial within boundaries and I am here to decide
23    what the boundaries are.
24         MR. CONTOS:  We have produced 300 pages of documents.
25         THE COURT:  Mr. Ambroise, what have you not gotten

1   from Bravo that you think they have that you should be entitled
2   to that is likely to lead to admissible evidence in this case?
3              MR. AMBROISE:  Your Honor, I sent Bravo a list of
4   search terms to use to search in response to, specifically, two
5   requests in the subpoena regarding communications between ACS
6   and the individual defendants and some named individuals that
7   were named in the subpoena request.  Because of third-party
8   discovery in this case we have learned of e-mails that were
9   used by the principal of Navillus who is one of the individual
10  defendants and we have sent those e-mails to Bravo and ask that
11  they use those terms as well to search.
12             THE COURT:  You say those terms.
13             MR. AMBROISE:  The e-mail addresses, specifically.
14             THE COURT:  I see.  Okay.
15             MR. AMBROISE:  And we asked Bravo to use those e-mail
16  addresses as well as the search terms we provided previously to
17  search their e-mails and electronically stored information for
18  communication with the named individuals in the subpoena who
19  are, among them, the individual defendants.
20             THE COURT:  What has Bravo produced to you, to date?
21             MR. AMBROISE:  Bravo has produced only contracts, or I
22  should say the contract.  Bravo has produced bidding documents.
23  Bravo has produced payment requisitions, insurance sheets.
24             THE COURT:  So the only thing that you are looking for
25  that hasn't been produced are these e-mails?

1   MR. AMBROISE:  The communications, yes, and e-mails
2   among them, but if there are other forms of communication we
3   would be interested in that.  And I have noted to Mr. Contos
4   that, as you know, these e-mails and communications are of
5   particular relevance and importance to us because, obviously,
6   we want to see with whom Bravo was communicating at ACS or
7   possibly at one of the alter ego entities so that we can
8   ascertain if there was any involvement from the defendants --
9   the named defendants in the complaint.
10   THE COURT:  What is your burden argument, Mr. Contos.
11   MR. CONTOS:  Your Honor, as I stated, on a project of
12   this size, Bravo has thousands and thousands of e-mails, not
13   necessarily between the defendants but they may mention the
14   defendants since ACS was working on that project as a
15   subcontractor.
16   THE COURT:  Well, but what if you limit them to the
17   addresses that he is giving you?
18   MR. CONTOS:  Well, I think if we are able to narrow
19   the search terms just to the e-mail addresses I think that
20   would be okay.
21   THE COURT:  What do you want besides that?
22   MR. AMBROISE:  I don't know that I want anything
23   besides that.  I would say that I am interested, or plaintiffs
24   are interested in e-mails that demonstrate communication
25   between the named individuals.

1               THE COURT:  That's going to be produced consistent
2     with his searching those e-mail addresses, isn't it?
3               MR. AMBROISE:  Presumably, yes.  And I provided some
4     other names on the very short list of search terms that we
5     actually had reduced because of Bravo's complaint to us that
6     the search terms were too much, we pared it down.
7               THE COURT:  But what you are really looking for is who
8     is involved in this particular project and what communications
9     were had so that you can either make your case or not be able
10    to make your case with respect to the alter egos, right?
11              MR. AMBROISE:  Yes.
12              THE COURT:  And the best way to get that, is it not,
13    is by him searching their files for these particular e-mail
14    addresses.  Wouldn't that be the best evidence of that?  I mean
15    the search terms, I don't know what they all are, but they may
16    or may not produce certain documents that may or may not be
17    quite as on-point as ones, certainly, that would include the
18    e-mail addresses, if I understand correctly.
19              Is that not right?
20              MR. AMBROISE:  My only concern with limiting it just
21    to the e-mail addresses is, if I remember correctly, I provided
22    a number of e-mail addresses that we had confirmed by, through
23    other third-party discovery, were used chiefly by Donal
24    O'Sullivan, one of the named defendants.  We did provide
25    another e-mail address for Owen Moriarty who is an employee at

1    ACS.  My only concern would be to the extent that limiting the

2    search only to the e-mails for Donald O'Sullivan and Owen

3    Moriarty, if there are e-mails or communication that involved

4    other named defendants or other people who were named in the

5    subpoena request, it may not be captured by limiting it only to

6    those e-mail addresses.

7             THE COURT:  I am sure that's true, but why wouldn't

8    the production of any e-mails that Mr. Contos's client

9    identifies as a result of the e-mail addresses that we are

10   talking about cannot be sort of the core documents that you

11   would be looking for here and would presumably implicate or be

12   related to any other documents that might not have the e-mail

13   addresses that you are talking about.

14            MR. AMBROISE:  I suppose the answer to that is that if

15   search results, if we got search results back using those

16   e-mail addresses, they would be part of our core case and so my

17   answer to you why would they not be, I believe that they would.

18   To the extent that we could have more evidence of more

19   communication than just the communication in those e-mails, I

20   think that would also be helpful to plaintiffs.

21            THE COURT:  Have you taken a deposition of a Bravo

22   witness in this case?

23            MR. AMBROISE:  No, your Honor.

24            THE COURT:  Are you planning to?

25            MR. AMBROISE:  At this stage we have not noticed a

1  Bravo witness for a deposition.
2          THE COURT:  Well, I mean, that bespeaks a certain
3  amount of -- I don't know what the right word is --
4  significance, perhaps, to the evidence that they're going to
5  produce and what use they're going to put to it.
6          How many e-mail addresses are we talking about now?
7  Just to be precise.
8          MR. AMBROISE:  Can I check?
9          THE COURT:  You may.
10         MR. AMBROISE:  And just to respond?
11         THE COURT:  Because I want the record to be clear
12 about what we are going to be stipulating to here, otherwise
13 I'm going to be directing.
14         MR. AMBROISE:  I would like to also respond to what
15 you mentioned a minute ago with regard to noticing a Bravo
16 witness for a deposition.
17         Often it is the communications that we uncover that
18 usually make it so that we want to invite these witnesses in to
19 discuss further the substance of that communication, how it
20 came to be.  In this case we have no communication and, hence,
21 we have no reason at this point to want to call in a Bravo
22 witness because we don't have any -- we don't have any of the
23 e-mails and hence we don't have the communication that would
24 normally necessitate having to call someone in to elaborate on
25 those communications.

1          THE COURT:  I can certainly conceive of a deposition
2    you can take of a Bravo witness in which you explore the
3    question of with whom they had contact with respect to the 20
4    East End Avenue project and whether that contact included one
5    of the named defendants or not or whether it was Mr. Donald
6    Sullivan or some other person affiliated with him.  I can
7    certainly envision such a deposition whether you had any
8    communications in hand or not.
9          But, that really doesn't matter that much right now, I
10   am just trying to resolve the pending dispute which is what
11   further searches is Bravo going to undertake and I want to be
12   crystal clear what we are having the parties agree to now which
13   is the e-mail addresses which consist of which e-mail
14   addresses.
15         That is the question I have for you.
16         MR. CONTOS:  Your Honor, there are four e-mail
17   addresses in the list of terms that Mr. Ambroise has provided
18   us.
19         MR. AMBROISE:  There are four that we have identified
20   as e-mail addresses that have been used by Donald O'Sullivan
21   and there is another e-mail address that we believe has been
22   used or is being used by Owen Moriarty who is an ACS employee.
23         THE COURT:  So that would be five different e-mail
24   addresses, in total?
25         MR. AMBROISE:  Yes, your Honor.

1    THE COURT:  Mr. Contos, so those are the five e-mail
2    addresses you are going to search for?
3    MR. CONTOS:  We would also like a 502(d), if possible,
4    because we have a concern that there is going to be sensitive
5    business information or there could be something privileged and
6    we just --
7    THE COURT:  I don't see why not, given that the other
8    third-parties have gotten them.
9    I'm sorry that you all have to come in here every
10   other week, it seems, to have to navigate this, but is there
11   any reason why there shouldn't be a 502(d) order in place with
12   respect to Bravo?
13   MR. AMBROISE:  I had offered one and it wasn't taken
14   up.
15   THE COURT:  Okay.  In any event, there will be a
16   502(d) order with respect to both non-parties who are present
17   today and your production, beyond what you have made to date,
18   will be the search of these five e-mail addresses and whatever
19   production that that necessitates.  Okay?
20   MR. CONTOS:  Yes, your Honor.
21   THE COURT:  Anything else with respect to any issues
22   related to either Bravo or JDS?
23   MR. AMBROISE:  Just to clarify, going back to
24   Mr. Kamien to clarify that the production within a week would
25   include a search by JDS of the search terms that we sent you

1    pursuant to our agreement.
2            MR. KAMIEN:  Yes, yes; to the extent they're within,
3    obviously, the possession of JDS and they haven't already been
4    produced by the defendants in the case.
5            THE COURT:  All right.
6            Now, are we done with this issue, gentlemen?  Are we
7    all set here?
8            MR. AMBROISE:  Yes, your Honor.  Thank you.
9            THE COURT:  Now, I have a letter that is dated March
10   2nd that has to do with text messages and, Mr. Grossman, you
11   wanted to inquire how much time you needed to respond to a
12   letter --
13           MR. GROSSMAN:  Yes, your Honor.
14           THE COURT:  -- so my law clerk tells me.  Can you get
15   me a letter by Thursday?
16           MR. GROSSMAN:  Sure.
17           THE COURT:  Are you all going to come back in here and
18   are we going to have another conversation?  Is that what we
19   going to do?
20           MR. AMBROISE:  I suppose --
21           THE COURT:  Have you had a meet and confer about this?
22           MR. GROSSMAN:  There has been numerous meet and
23   confers.
24           THE COURT:  I am not prejudging this, but you are
25   willing to provide everything but the substance of the texts?

1   Is that what I understand your position is?
2             MR. GROSSMAN:  That is our position, given that we
3   have explicitly requested text messages from plaintiffs and
4   that request was made on January 6 and plaintiffs, for the
5   first time on February 20th, asked us for text messages and now
6   they're pushing us on text messages and after explicitly
7   requesting them for first time on February 20th, but they have
8   admitted to us and represented to us during meet and confers
9   that they haven't even asked their clients whether they have
10  responsive text messages.
11            THE COURT:  So this is a
12  what's-good-for-the-goose-is-good-for-the-gander kind of
13  argument?  Yes?
14            I mean, at the end of the day I'm going to be
15  hard-pressed to understand why you both shouldn't produce text
16  messages to each other.  Do you really need to write a letter?
17  Do you really need to come back here?  Why shouldn't we just
18  stipulate that you are both going to produce text messages to
19  each other and you will do it within 10 days of today?
20            MR. GROSSMAN:  I would be fine stipulating to that, as
21  long as every single one of their plaintiff trustees phones are
22  imaged the way we are going to image our phone.
23            THE COURT:  Is there a burden issue there?  How many
24  people are we talking about?  Why are you resistant to this?
25            I am just trying to make short work of this or else he

1    will good back and write a letter, you are going to come in
2    here and you are here now.  Can't we cut through this?  What is
3    the reason you shouldn't have to do your part in this?
4             MR. GROSSMAN:  And one additional thing.  We also
5    explicitly requested text messages of all of the non-parties
6    that we subpoenaed and they have not asked them either to
7    produce any text messages so that is an additional five people
8    that they're representing.
9             THE COURT:  Who are you referring to now?
10            MR. GROSSMAN:  There were five nonparties who they're
11   representing for purposes of deposition, I guess people they've
12   worked with in trying to gather information that our clients
13   are alter egos and so we have issued subpoena *duces tecum* to
14   those individuals and as they've done with their plaintiff
15   trustees that they represent, they haven't asked those
16   non-parties whether they have responsive texts either.
17            THE COURT:  By the way, what is it in their text that
18   is going to be probative or relevant to your defense?
19            MR. GROSSMAN:  Everything about the investigation into
20   the alter ego allegations in this case and everything else that
21   they have.  At this point we haven't been provided with much in
22   the way of information that substantiates any of their claims
23   so we would like to have knowledge as to what they're basing
24   any of these claims on.
25            THE COURT:  Well, I guess I'm not understanding why

1    you think their texts are going to be probative of their alter
2    ego theory.  What would they have in their texts that would be
3    relevant to them?
4         MR. GROSSMAN:  It is an informal way that union
5    business agents communicate with each other so, for instance,
6    you will have a business agent at the District Council of
7    Carpenters who is outside of ACS' job and they're talking about
8    how they just spoke to a superintendent and there is some sort
9    of connection that they think is happening between the
10   companies and we want to know who they text that to and what
11   that person who received it did with that information and sort
12   of get a little sense of what they're basing their allegations
13   on.
14        THE COURT:  Mr. Ambroise, is there resistance on your
15   part to providing this?
16        MR. AMBROISE:  Your Honor, I will confess that I was
17   not part of the conference call where this was discussed and
18   this was not something that I was prepared to provide --
19        THE COURT:  Address today.
20        MR. AMBROISE:  Provide any feedback on.  And I
21   apologize for that.
22        THE COURT:  Well, let's do this.  Have a further meet
23   and confer between now and Thursday and figure out if you can
24   stipulate to a mutual production of text messages and, if you
25   can, given that your discovery cutoff is now March 23rd, I

F335mooC

1   believe, if I remember correctly.  Is that correct?
2             MR. AMBROISE:  Yes, your Honor.
3             THE COURT:  So then I would say if you can agree to
4   that, then I would make your production to each other by the
5   13th.  If you can't agree after further meet and confer, then
6   Mr. Grossman, you should submit a letter to me no later than
7   5:00 on Thursday, the 5th.  Okay?
8             MR. GROSSMAN:  Sure.
9             THE COURT:  And then shall we pick a time right now
10  for you all to come back?
11            MR. GROSSMAN:  I think that would be wise, just
12  because we have a lot of depositions planned and we don't have
13  much time.
14            THE COURT:  Let me ask my deputy to pull up our
15  calendar.
16            How about this Friday afternoon?  No good.
17            MR. GROSSMAN:  I have two depositions in this case.
18            THE COURT:  How about Monday the 9th?
19            MR. GROSSMAN:  Monday the 9th will work for us, in the
20  afternoon.
21            THE COURT:  Okay, Mr. Ambroise, can you do Monday
22  afternoon?  You or someone?
23            MR. AMBROISE:  I don't have the deposition schedule
24  with me.  I will say yes but if changes arise or if it can't be
25  done --

F335mooC

1          THE COURT:  Wouldn't Mr. Grossman have a conflict if
2    there was one?  Not necessarily.
3          MR. GROSSMAN:  No, not necessarily; there are two
4    other law firms.
5          THE COURT:  Either you or Mr. Kennedy or one of your
6    colleagues can be here on the 9th at 3:00.
7          MR. AMBROISE:  I think it is doable, yes.
8          THE COURT:  Obviously, if it becomes a problem, talk
9    to Mr. Grossman and call my deputy and find another date but I
10   am eager to get this resolved as soon as possible given the
11   time line you all are working under.
12         So, you are going to have a further meet and confer,
13   you are going to see if you can stipulate to this.  If you
14   can't, you will send me a letter by 5:00 on the 5th and I am
15   going to see you or someone representing your side on the 9th
16   at 3:00 here.
17         MR. GROSSMAN:  Sure.
18         THE COURT:  Okay?
19         MR. AMBROISE:  Thank you, your Honor.  Yes.
20         THE COURT:  Anything else?
21         MR. AMBROISE:  No, your Honor, not from plaintiffs.
22         THE COURT:  All right.  Until the next time.
23                              o0o