F3BFMOOC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   TERRENCE MOORE, et al,

4             Plaintiffs,

5         v.               14 CV 8326 (CM)

6   NAVILLUS TILE, INC., et al,

7             Defendants.

8   ------------------------------x
                           New York, N.Y.
9                           March 11, 2015
                           3:00 p.m.
10

   Before:
11
                  HON. JAMES L. COTT,
12
                            Magistrate Judge
13
                  APPEARANCES
14
   MARCUS ROSENBERG & DIAMOND, LLC
15      Attorneys for Bravo Builders, LLC
   MICHAEL T. CONTOS, ESQ.
16

   SPIVAK LIPTON LLP
17      Attorneys for NYC District Council of Carpenters
   JAMES M. MURPHY, ESQ.
18   GILLIAN COSTELLO, ESQ.

19   CROMWELL & MORING LLP
       Independent Monitor
20   GLEN McGORTY, ESQ.

21   JONES DAY
       Attorneys for Defendants Navillus Tile, Donal O'Sullivan
22   and Helen O'Sullivan
   JOSH GROSSMAN, ESQ.
23

   PECKAR & ABRAMSON
24      Attorneys for Defendants Time Square and Kevin O'Sullivan
   GREGORY R. BEGG, ESQ.
25

1          (Case called)

2          (In open court)

3          THE DEPUTY CLERK:  Terrence Moore, et al v. Navillus

4     Tile, Inc., et al.  Counsel, state your names for the record.

5          MR. MURPHY:  James M. Murphy, Spivak Lipton.

6          MS. COSTELLO:  Gillian Costello, also Spivak Lipton,

7     for District Council.

8          MR. McGORTY:  Glen McGorty only in my role as

9     independent monitor should the Court have any concerns or

10    questions I can answer.

11         MR. GROSSMAN:  Josh Grossman for Navillus Tile, Donal

12    O'Sullivan.

13         MR. BEGG:  Gregory Begg for Time Square and Kevin

14    O'Sullivan.

15         MR. CONTOS:  Michael Contos for Bravo Builders.

16         THE COURT:  The first thing I want to say for the

17    record, it was completely unclear from the letters that counsel

18    sent to the Court when you asked the Court to undertake in

19    camera review that we were talking about 2500 documents.  It

20    would have been much more helpful if you had made that clear to

21    me and of course we received the box at 5:00 on Monday giving

22    me not very much time to review the materials, but I have

23    looked at them so I understand what we're talking about.

24         I have a number of threshold issues that I want to

25    raise.  The first question is, the subpoena was originally

served on January 26 and was not responded to until February 17

and now it's March 11. So is there a waiver issue here that I

need to be concerned about? Have you not, Mr. Murphy, waived

the right to even invoke this privilege?

MR. MURPHY: Your Honor, we --

THE COURT: Can you stand when you speak to the Court,

please?

MR. MURPHY: Yes. Sorry, I apologize. We got an

extension from defendants to do our production on February 17

and with that production on February 17 we gave them the

privilege log and it was later in that week that I received a

call from one of the other defendants firms, from Mr. Begg

wanting to discuss the privilege issue with respect to the

Inspector General's documents. I told them that I would have

to discuss that with our outside counsel, Barbara Jones, and

with the independent monitor, Mr. McGorty, since Mr. McGorty

was assigning confidential investigations to the Inspector

General's office.

So I responded then the following Tuesday with the

letter to the Court.

THE COURT: Well, let's assume for the moment that

I'll consider this application a timely one. Why does the law

enforcement privilege apply to this case? The union is not a

governmental entity. It's my understanding of the law that

this privilege applies only and can be invoked by the

1    government.  Why would it apply here?

2           MR. MURPHY:  Because, your Honor, the Inspector

3    General's office plays a special role under United States v.

4    District Council in that the Inspector General and the Deputy

5    Inspector General hiring has to be approved by the Office of

6    the United States Attorney.  They cannot be terminated and the

7    bylaws which were approved by the United States Attorney's

8    Office cannot be amended or changed in any way except with the

9    approval of the United States Attorney's Office, provides for

10   the Inspector General to conduct these investigations,

11   including making referrals to law enforcement agencies or

12   making other referrals for possible criminal prosecutions.

13          THE COURT:  Well, the Inspector General exists and did

14   exist before there was a consent decree with the government, is

15   that not true?

16          MR. MURPHY:  That's not true.

17          THE COURT:  There was no Inspector General or anything

18   like that at the union?

19          MR. MURPHY:  Before the consent decree in 1994, no,

20   your Honor, there wasn't.

21          THE COURT:  There was no entity of any kind that

22   investigated corruption or malfeasance within the union,

23   whether they were called an Inspector General or not?

24          MR. MURPHY:  There was what was called the

25   anticorruption committee.  The current Inspector General, Scott

1    Danielson, was a member of that committee and I think played a

2    crucial role in helping to investigate and then act as a

3    witness on behalf of the U.S. Attorney's Office for the

4    prosecutions that arose out of the indictments in mid to late

5    2009, about 23 union officials as well as others who were

6    indicted and convicted.

7         THE COURT:  So you're hanging your hat, essentially,

8    on the nexus between the fact that the union has a consent

9    decree with the government and the fact that the Inspector

10   General is a creature of that consent decree and therefore the

11   investigations that the Inspector General undertakes somehow is

12   at -- maybe this isn't the right word -- but at the behest of

13   the government in some way?  Is that the argument why this law

14   enforcement privilege should be invoked here?

15        MR. MURPHY:  I think it's at the behest of the

16   government and the Court in the sense of the consent decree and

17   the current stipulation and order to rid the District Council

18   of racketeering, labor corruption, and to make sure that it

19   stays clean as it moves forward into the future.

20        THE COURT:  Well, I mean, first of all, this was not

21   an issue that was at all addressed in your papers or, frankly,

22   in the defendants' papers and there's not a lot of law on the

23   subject because I've researched it and it's not surprising

24   there isn't a lot of law on it because unions and private

25   employers don't generally invoke the law enforcement privilege.

1  If there's some corporation that has some internal

2  investigative component do you think it also would be allowed

3  to invoke the law enforcement privilege because they would be

4  undertaking something that might ultimately result in the

5  referral of criminal charges to the government?  Because that's

6  the analogy you're making.

7       MR. MURPHY:  Yes.  I think it depends upon the

8  circumstances and the context.  I think the history of the

9  District Council and the government and the Court's efforts to

10  clean it up beginning with the filing of the 1990 RICO case and

11  then the imposition of the 1994 consent decree and all the

12  activities from that time forward, then including the necessity

13  of appointing a review officer in 2010 following the 2009

14  indictments and convictions, I think it counseled that the

15  current role of the Inspector General under the bylaws and

16  under the supervision now of an independent monitor and under

17  the continued supervision of the government and the District

18  Court would counsel in favor of affording the Inspector General

19  a qualified law enforcement privilege.

20       THE COURT:  Well, even if I accept all of that, what

21  do I now have in front of me that's in the record that supports

22  that?  And I'll tell you what I have.  This is what I have:  I

23  have a letter from you in which you say that Mr. McGorty has

24  told us that he believes it is crucial to protect the integrity

25  of the Inspector General's office, including its investigatory

methods, investigation of both unknown parties and the

confidentiality afforded to participating persons.  That's the

sum and substance of what I have to support your invocation of

the law enforcement privilege.  I don't have a declaration from

Mr. McGorty.  I don't have a declaration from the Inspector

General.  I don't have any information about the nature of

these investigations.  I don't have anything that implicates

what the law enforcement privilege is designed to protect so

that I can evaluate whether this is a proper invocation.

I look in a box that you send me and you think that I

can draw from my review of that box an assessment of whether

there would be some undermining of the confidentiality of

sources other than in the generic sense of things or, for

example, that law enforcement techniques and procedures are

implicated?  Is the IG's investigation considered law

enforcement techniques?  I could go on.  I have about 50

questions like this, none of which have been answered and the

record before me hasn't been developed at all.  So I'm very

uncomfortable with the notion that the law enforcement

privilege applies here.  I really don't see how it does.  Just

because the Inspector General and the monitor don't like the

fact that these files potentially could be reviewed by a

non-party.

Now, that said, I have equal problems with the folks

at the other table because they've served you with an

F3BFMOOC

1    extraordinarily broad, indeed inherently overbroad document

2    request which then necessitated you and your colleagues in your

3    best judgment to err on the side of I think amassing anything

4    that possibly could come within the broad contours.  So

5    therefore I have 2500 pages, I'm not going to quantify it, but

6    some significant percentage in my quick review that I wouldn't

7    consider responsive to the inquiry.  And, you know, at the end

8    of the day, given that discovery in this case closes in two

9    weeks from today there are an awful lot of nuanced and

10   complicated legal issues that I would prefer not to have to

11   resolve because I would prefer to kind of cut through all of

12   this and figure out a common sense solution.

13           Which takes me back to my first and most important

14   issue that I want to raise with you, which I know has been

15   discussed previously.  Why wouldn't an attorneys eyes only

16   review of those documents in your offices be the appropriate

17   resolution here?

18           MR. MURPHY:  I would just have some concerns about the

19   security of certain information, especially confidential

20   informants.  And the identities of the investigators, their

21   vehicles to the extent that can be inferred from the various

22   documents.  If I may, your Honor, we would certainly be happy

23   to supplement the record.  We also are developing and could

24   submit to the Court --

25           THE COURT:  I don't want you to supplement the record.

F3BFMOOC

1   We have two weeks to go. Judge McMahon has already extended

2   discovery in this case.  I can't predict if she will again.  I

3   know another application was made to her today to extend it for

4   two days.  My sense is the lawyers are not expecting to receive

5   a further extension of discovery.

6           You should have submitted a declaration to me from Mr.

7   McGorty before today.  You should have written me longer than a

8   two-page letter assuming the law enforcement privilege applied

9   when there are serious questions about whether it does or

10  doesn't.  I don't have time given the speed at which this case

11  is moving along to wait for this.  I'm trying to figure out a

12  practical common sense solution.  If you're willing to do an

13  attorneys eyes only with redactions so the names of

14  confidential sources, investigators and the like are not

15  revealed, then maybe that's something we should consider.

16          MR. MURPHY:  Okay.

17          THE COURT:  I understand the sensitivity of what

18  you're raising but there are an awful lot of complex questions

19  here that the parties sort of glossed over and I can't gloss

20  over them if I'm really going to dig into what's before me

21  here.  But as is often the case there are practical solutions

22  that can be had and I have other questions for folks at the

23  defense table before we work out any formal arrangement of some

24  kind of attorneys eyes only review and a protective order with

25  redactions.  But that's what to me makes the most sense given

1    all the problems that I see in front of me.  All right?  But

2    let me hear, who is going to speak for defendants?

3              MR. BEGG:  Gregory Begg, your Honor.

4              THE COURT:  First of all, let's assume for the moment

5    that the law enforcement privilege does apply in some fashion

6    here and you all didn't make an argument that it didn't apply.

7    You didn't cite any cases or anything like that.  But let's

8    assume for the moment it does apply, all right?  Now, it is a

9    qualified privilege, to be sure.

10             MR. BEGG:  Correct.

11             THE COURT:  What compelling need do you have at the

12   back table that you're going to derive from that box of

13   materials that doesn't already exist so that this isn't

14   basically just an exercise in corroboration?  What do you

15   expect to find that you think would be different from what you

16   already have given that the nature of your request is -- if I

17   can find it -- you want all documents, all documents,

18   communications and/or correspondence concerning Navillus, Time

19   Square, ACS, HDK, Donal O'Sullivan and/or Kevin O'Sullivan that

20   relate to the allegation that Navillus, Time Square, HDK and/or

21   ACS are involved in or have control over the operations,

22   management, labor relations, projects, equipment or ownership

23   of one another or that Navillus, Time Square, HDK and/or ACS

24   are related to one another in any way.  That's what you've

25   asked for.

F3BFMOOC

1          That's awfully broad and what is it that you think

2     this non-party has that's responsive to this request that you

3     have not gotten in discovery in other ways and/or that you

4     don't have within your own posession?

5          MR. BEGG:  Okay.

6          THE COURT:  Given that you are these people.

7          MR. BEGG:  Sure.  First of all, we subpoenaed the

8     District Council; Ed McWilliams, who is a union official,

9     Michael Donnelly, who is a union official, James Macon, who is

10    a union official and Ruben Colon, who is a union official for

11    the carpenters union.  We subpoenaed those because they were

12    identified by the plaintiffs' counsel as the key people

13    supporting their case.  We asked for information through the

14    plaintiffs' attorney.  We were directed to serve subpoenas on

15    the union itself, those union entities, the parties themselves,

16    which we did.  We were told they were the witnesses.  That's

17    why we subpoenaed them.

18         I don't think our request is over broad.  It asks for

19    exactly what is at issue here.  What evidence do you have that

20    these parties are alter egos of each other, that they are

21    acting as one entity.  Plaintiffs have told us that's where we

22    have the information.  These are the witnesses who have the

23    information.  We served the subpoenas and then we're told

24    whatever information they have is protected by privilege.

25         THE COURT:  Have you deposed any of them?

F3BFMOOC

1          MR. BEGG:  We've deposed several of them and left the

2      depositions open pending the production that we're disputing

3      here.

4          THE COURT:  And what is it that you think this

5      production will enhance as far as the information you've

6      already adduced from them under oath at their depositions?

7          MR. BEGG:  I wouldn't know unless I saw the

8      information, your Honor.  But they're telling us, they told us

9      the information they have to support their case can be obtained

10     through those parties and those parties are saying I can't

11     provide it to you and the plaintiffs aren't providing it to us

12     either.

13         THE COURT:  No, hold on --

14         MR. BEGG:  I don't know whether plaintiffs ever

15     received the information from the IG's office that we're

16     seeking.  I don't know whether they have.

17         THE COURT:  Well, let's come back to that later.  Let

18     me ask you this:  Let's say there's a file in there that

19     reflects that the Inspector General has investigated whether a

20     union member admitted working for a non-union contractor, okay?

21     In the jurisdiction of the carpenters, so it was something he

22     shouldn't have done.  Okay?  How is that going to be relevant

23     or helpful to your case, your defense?

24         MR. BEGG:  If they use the fact that a particular

25     trade worker worked, which they are alleging, just because a

1  particular trade worker worked for Navillus, which is a union

2  entity and also worked for ACS which is a non-union entity, the

3  fact that they worked for both employers is evidence of alter

4  ego status.  That's the argument the plaintiffs are making.

5       THE COURT:  And you questioned these union employees

6  who were deposed about this subject already?

7       MR. BEGG:  Some of them.  Not all of them.  And at

8  deposition other privileges were asserted as well, such as

9  attorney-client, which I dispute but it's not worth fighting

10  over, the assertion of attorney-client privilege at several of

11  these depositions.  At that point they were taking the position

12  that there were these coalition meetings between these various

13  trades where they were discussing the alleged alter ego status.

14  The plaintiff's law firm, Tom Kennedy the chief counsel

15  attended those meetings.  Just because he attended those

16  meetings they asserted attorney-client privilege, that

17  prevented these witnesses from testifying about what occurred

18  at these meetings, discussing the facts and evidence that they

19  were collecting against our clients.  So we're being frustrated

20  and kind of stonewalled by the plaintiffs' firm being directed

21  to try to get these files elsewhere, now we're told the

22  privilege exists.

23       By the way, I agree with the practical solution.  I

24  suggested to Mr. Murphy, I wouldn't know whether what you have

25  I need or not.  I right away said let's do attorneys eyes only,

1   the quickest way.  I'll review it, if I don't need it I don't

2   need it.  I hope I don't.

3           THE COURT:  How do you feel about the proposed

4   redactions?

5           MR. BEGG:  I'll get to that in a second.  I would be

6   happy to do that.  My proposal to him was let me do the

7   attorneys eyes only review.  If there's a document I think is

8   relevant that I need we can fight over that later some other

9   time and ask the Court for specific relief on specific

10  documents.  I was not aware at any time of the volume of the

11  papers.  I looked at the privilege log.  I thought there were

12  only a few.  I was not aware there were several thousand.  That

13  wasn't brought to my attention.

14          In terms of redactions I don't think they've

15  established by any means an entitlement to privilege.  It's a

16  private entity.  Even if the private entity was working at the

17  behest of or in cooperation with a government law enforcement

18  agency there might be a privilege and still then and only then

19  is it a qualified privilege.

20          Second, you've got to make a specific showing, an

21  articulation with respect to each document or kind of document

22  or information you're trying to protect to show why is this

23  sensitive and what law enforcement interest is at stake in

24  disclosing that and that's not been made.  And they use words

25  like "confidential informant."  Who is a confidential

1    informant?  To me that's just a witness unless they're working

2    at the behest of or under the direction of a legitimate

3    governmental law enforcement agency.  Same with they're worried

4    about protecting the identity of investigative vehicles.  I

5    don't know what that means.  Is that -- by the way, the way

6    this has been described, the union itself has its own -- it's

7    not called the Inspector General.  The witnesses that we're

8    deposing they, sort of categorized or stylized themselves as

9    part of an investigative team that works within the Carpenters

10   Union and outside of the Carpenters Union in this coalition

11   with several other trades that are plaintiffs in this case as

12   well as working with a consulting group called Locker

13   Associates that apparently was collecting information and doing

14   this quote-unquote investigation.

15           Every person we asked at some point or other said this

16   was a confidential investigation.  I see no legal basis for

17   that.  Your Honor, I'd be happy -- I don't know the volume of

18   paper we have here -- I'd be happy to sign an attorneys eyes

19   only, go through those documents as quickly as possible.  It

20   may be that there isn't much relevant there and if there's a

21   specific document that he can articulate whether that specific

22   document needs some protection or not, and I can argue against

23   that position.  I need to move on.  I asked him immediately, he

24   said give me one week and I'll speak to the IG.  One week went

25   by and he said I need another week, then he said he would

F3BFMOOC

1    produce the document to the Court.  Instead he wrote a letter

2    without producing them.

3          Time has gone on.  We're already through these

4    depositions, I'm looking for the most practical solution.  I

5    don't care to litigate or need a decision on law enforcement

6    privilege, frankly.  So I think there's a practical solution.

7    I'm willing to cooperate.

8          THE COURT:  Mr. Murphy, have you produced these

9    documents to the plaintiffs?

10          MR. MURPHY:  Which documents, your Honor?

11          THE COURT:  The documents in the box by the foot of my

12    law clerk.

13          MR. MURPHY:  We've produced nearly 4,000 other

14    documents and not held any of them to be confidential.  They're

15    from the District Council as well as the records of the four

16    union employees, officials that were individually subpoenaed

17    and from whom depositions have been taken or will be taken so

18    that the impression that there are documents that have been

19    somehow hidden away under the auspices of the Inspector General

20    are simply not true.  As I said, we produced nearly 4,000

21    documents.  Maybe we overly produced, but we took the subpoenas

22    seriously and read them as broadly as possible and produced

23    documents to the defendants in response to those subpoenas.

24          The one area where we looked to make a distinction in

25    that or draw a line is with the office of the Inspector

F3BFMOOC

1    General.

2         THE COURT:  Well, can you articulate for me why

3    redactions of certain information in the collection that I have

4    is necessary for an attorneys eyes only review?

5         MR. MURPHY:  Because it would show, without the

6    redaction, the identities of people who are providing

7    information to the Inspector General would be revealed, the

8    identities of confidential informants would be revealed and the

9    identities of certain of the Inspector General's own

10   investigators would also be revealed.  That's why we -- we

11   would certainly agree to redaction of that material.

12        THE COURT:  Revealed to an attorney.

13        MR. MURPHY:  Yes.  Then what?

14        THE COURT:  Revealed to an attorney and what's your

15   fear if that's revealed and he's subject to a Court order that

16   says that he can't do anything with it other than to make a

17   judgment as to whether it's necessary for his litigating

18   position in which case he will then discuss it with you and if

19   you prevent him from wanting to use some documents then we'll

20   further litigate that but it will not be a box of 2500

21   documents, it will be eight documents and then we'll talk about

22   whether he needs those eight documents.  Do you think he's

23   going to write down the names of all of those people and go

24   back and tell his clients?  He would be violating a Court

25   order.  He would be held in contempt.

1          MR. MURPHY:  I understand that.

2          THE COURT:  I'm trying to understand why an attorneys

3     eyes only solution here isn't practical and efficient.  I'm

4     trying to give you an opportunity to articulate it if I'm

5     missing something.

6          MR. MURPHY:  It's just trying to protect the integrity

7     of the entire process with the Inspector General's office.

8          THE COURT:  But that's at a level of generality that I

9     don't know how to get my arms around, with all due respect.  I

10    don't really know what that means.  I mean, no one likes

11    someone else looking at one's internal investigations

12    generically, I understand that.  But the issue in this case, as

13    I understand it, is the interrelationship among these companies

14    and if there are union members who are sort of playing both

15    sides of the fence, if I can put it that way, and that has been

16    under investigation in some sense, that fact alone it seems to

17    me wouldn't be privileged and protected.

18         MR. MURPHY:  That fact that they would have

19    themselves -- I don't think there's any compelling interest

20    much less a compelling need for them to see these documents.

21    As your Honor suggested, all of the documents that would go to

22    their defense are in their custody and control as to whether or

23    not they've kept up the corporate formalities, kept up separate

24    finances, labor relations and other factors that would go into

25    establishing or that they are or not alter egos of each other

F3BFMOOC

1   or a single employer.  The burden of production and persuasion

2   in this case is on the plaintiff's funds.  We're a third party.

3         THE COURT:  Right, but Mr. Begg tells me that the

4   plaintiffs at least in part have indicated they are relying on

5   information from your clients.  So if that's true --

6         PLAINTIFF:  That's been provided.  As I said, we've

7   produced almost 4,000 documents.

8         MR. BEGG:  May I be heard, your Honor?

9         THE COURT:  Yes.  Mr. Begg.

10         MR. BEGG:  There's one example that's relative.

11   There's been identified a witness Wilson Bravo.  He's a union

12   member and identified also as a union salt.  I don't know if

13   your Honor is familiar with that term.  A union salt, s-a-l-t,

14   is a union worker who is sent by the union to work for a

15   non-union employer, to essentially act as a spy.  He's been

16   identified as the witness by the plaintiffs as someone who has

17   got critical information relating to their allegations.  He

18   works for one of the non-union entities and our experience so

19   far has been when we ask somebody to get down to the nitty

20   gritty of what do you know about alter ego, they say privilege.

21   They're being identified as somebody with knowledge but then at

22   the deposition they say this is privileged.

23         I'm guessing, but I don't know, perhaps, that Wilson

24   Bravo is someone that maybe the IG's office considers as a

25   confidential witness, although I dispute that's got any legal

1    significance and he's a witness.  He's identified as a witness.

2    So if the Inspector General has information about Wilson Bravo

3    and his acting as a union salt or spy that's certainly relevant

4    to the case.  I don't necessarily need to know the identity of

5    anyone else and if I did then we can dispute that.  I doubt it.

6    So I'm happy to go with that solution.  But I think the

7    portrayal here as being fair and honest and open so far is a

8    bit much and we're concerned, obviously, that somebody is

9    hiding the ball here.  We don't want that to happen.

10          I'll give you another example.  There have been

11   photographs and videotapes produced in discovery and every

12   witness we've asked so far says I have no knowledge of where

13   those photos and videotapes came from.  There have been

14   postings on social media that disparage our client.  So far

15   everyone is saying I have no knowledge of where those things

16   came from, where those photographs came from or who posted

17   them.  I don't, frankly, believe that, but we'd like to get to

18   the bottom of this, your Honor.

19          THE COURT:  When you say you'll accept that practical

20   solution does that mean that you'll be amenable to reviewing

21   this document collection with certain redactions?

22          MR. BEGG:  My only fear about redactions, your Honor,

23   is the time frame we're talking about here.  Wilson Bravo is

24   being deposed tomorrow.  I deposed a union witness yesterday, a

25   union witness last week.  We're running out of time.  For them

F3BFMOOC

1   to go ahead now at this stage and have additional time for

2   redactions I think is unnecessary, causing too much delay given

3   all the time we've had so far to get past this solution

4   especially since they've articulated zero specific legitimate

5   governmental investigative interest to be protected by the two

6   things I heard, the identity of a quote-unquote confidential

7   informant and investigators vehicles.

8           THE COURT:  Mr. McGorty, do you want to be heard at

9   all?

10          MR. McGORTY:  Your Honor, briefly, I'd like to if you

11  don't mind and I appreciate you letting me speak.  I was not

12  asked to supply a declaration.  I would have been happy to and

13  would be happy to for your Honor, but I appreciate your

14  concerns about timing in this case.  I don't have a view about

15  how the balancing tests in this particular case ends up between

16  what the compelling needs of the parties are, but I am here to

17  support the notion that the IG in this particular case, in this

18  particular organization serves in a law enforcement function

19  and I appreciate that there isn't a lot of case law out there

20  about this.  The IG in my brief experience working at the union

21  as the independent monitor appointed by Judge Berman, I worked

22  with Mr. Danielson on a day-to-day basis.  I assign

23  investigations for him that come to my attention.  There are

24  confidential and anonymous tips provided -- anonymous publicly,

25  not anonymous from the IG's office's perspective.

1    In order to foster an environment where there is no

2 monitor needed, there is no Court oversight, the IG in its

3 current form has been installed by my predecessor and approved

4 by the Court to clean up the union and continue the efforts to

5 clean up the union.  It is serving in as much of a law

6 enforcement function as an office in a private entity can.  It

7 answers to me and it answers to the Court.  It doesn't answer

8 to the members of the union.  It has a separate hiring practice

9 and a separate oversight program than perhaps the corollary

10 organization or committee did many, many years ago.

11    So I would only add, your Honor, to bolster the

12 argument that there is relevance to the confidential identities

13 of individuals who come forward to raise issues of corruption

14 to the IG.  There are files kept that maintain information

15 about surveillance and investigative functions, all things that

16 are akin to what would be corollary in a government

17 organization and in this particular instance this IG's office

18 answers to this Court and me as the agent of the Court.  So I

19 think it's an unusual circumstance.  I do not think by

20 suggesting there is some qualified privilege here for some

21 types of documents or certain parts of documents it is going

22 down the road, which I know your Honor is hesitant to do, to

23 suggest that any organization that performs any sort of

24 investigation internally can raise this issue.  I do not think

25 that's the case.

1          Is there a compromise to be had?  Again, I'm here

2  without an interest in a sense.  Maybe there is, but I do think

3  that compromise should include any efforts your Honor could

4  impose to preserve the integrity of the types of documents, and

5  not everything, but the types of documents and information that

6  the IG only has, that no one else in the union has, that

7  relates to this investigation effort that the Court is

8  overseeing.  That's my view.

9          THE COURT:  All right.  Thank you, Mr. McGorty.

10  Mr. Murphy, did you want to say anything else?

11          MS. COSTELLO:  Your Honor, I did want to just --

12          THE COURT:  You're not Mr. Murphy.

13          MS. COSTELLO:  I'm Ms. Costello, your Honor.  Gillian

14  Costello.

15          THE COURT:  You're now speaking for your client?

16          MS. COSTELLO:  I am, your Honor.

17          THE COURT:  That is looked on with disfavor by this

18  Court?

19          MS. COSTELLO:  I'm sorry, your Honor.  Would you like

20  me to sit down?

21          THE COURT:  Well, I don't know.  Do you have something

22  to add to this --

23          MS. COSTELLO:  Just, I did want to highlight something

24  your Honor raised which is with regard to the compelling issue

25  in this case.  Of course all three go with something that the

F3BFMOOC

1    knowledge is typically within the knowledge of the defendant

2    itself and we are a third party, as you know.  There's been a

3    lot of talk about what witnesses have argued in terms of

4    privilege and what plaintiffs have said.  We don't know about

5    that, that's not what we're doing here.  We're protecting the

6    integrity of this office.  But in terms of what we have

7    produced, we have produced everything to everyone.  It's not

8    that the plaintiffs have access to that IG information.  The IG

9    has been very stingy about anybody seeing that information.  So

10   insofar as the information is out from the union they have it

11   and the plaintiffs have it.  And so this is not something that

12   would be, for instance, a surprise at trial that the plaintiffs

13   would have within that box.  And I did just want to make that

14   clear to your Honor.

15            THE COURT:  Can you or Mr. Murphy describe for me for

16   the record what the nature of the production that has been made

17   includes?

18            MS. COSTELLO:  Sure.  In large part, your Honor, I

19   think it would look very familiar to what your Honor has

20   already seen.  There are so far what has been produced is

21   permits, governmental documents from agencies.  It's research

22   on the corporate entities.  It is research about Wilson Bravo,

23   photographs of Wilson Bravo, texts from Mr. Wilson Bravo.

24   Texts from other individuals who communicated with union

25   officials.  E-mails between the individuals and Locker

1    Associates about this organization.  What you are looking at

2    now are the files of the Inspector General and they have been

3    segregated here.  I just didn't want there to be an impression

4    that the plaintiffs are sitting on this information that has

5    been withheld from the defendants and we have done that.  What

6    we have produced we have produced to everyone and what we've

7    withheld we've withheld from everyone.

8            Thank you, your Honor.

9            THE COURT:  If we were going to undertake some sort of

10   an attorneys eyes only review and you wanted to do some

11   redactions consistent with what you've articulated, how long

12   would that take?  And, by the way there is some duplication,

13   and that's an understatement, in the materials that you

14   provided for me.

15           MS. COSTELLO:  Your Honor, that duplication reflects

16   the files themselves and that's why they were provided that

17   way.  There's a large amount of duplicative information, I do

18   agree with that.  I think we could have this to the other side

19   or however you want to do it by the end of the day on Friday.

20           THE COURT:  That seems reasonable to me.  I certainly

21   don't want to have it.  I brought the box up here to give it

22   back.

23           MS. COSTELLO:  Oh, no.  Okay.

24           THE COURT:  So I'm trying to disassociate myself from

25   this massive collection of documents unless there's something

F3BFMOOC

1    further that I need to do.  Mr. Begg, attorneys eyes only

2    review on Monday, okay?  You all get a Court order to me that I

3    can sign between now and Monday and, Mr. Begg, or one of your

4    colleagues on Monday can have at this with whatever redactions

5    they're going to make so it's available to you by the opening

6    of business on Monday.

7              MR. BEGG:  I just ask it be a day sooner, your Honor.

8              THE COURT:  What is that?

9              MR. BEGG:  I would ask it be a day sooner.  We've held

10   three depositions open.

11             THE COURT:  It's already Wednesday afternoon.  We're

12   talking about 48 hours.  That's rather reasonable, it seems to

13   me.  You're asking to see it on Friday instead of Monday?  Why?

14             MR. BEGG:  Because we're running out of time.  We've

15   already done three of these depositions.  We have another one

16   tomorrow.  We're on a very tight time frame.

17             THE COURT:  I'm not convinced that it's going to make

18   that much of a difference because I'm not convinced having

19   looked at this that your world is going to be rocked when you

20   see this, okay?

21             MR. BEGG:  I rather hope so.

22             THE COURT:  To use a phrase.  I mean, I could be

23   wrong, but given what counsel has described that has been

24   produced to you already, I certainly think it's a fair

25   statement for me to say without compromising anything that at

F3BFMOOC

1    least some of what you'll see is of a piece with what you've

2    already seen.

3            MR. BEGG:  Very good, your Honor.

4            THE COURT:  If I'm wrong and you all have more fights,

5    I know I'm going to hear about it, and you'll get in before me

6    again in due course.  It's a Court-imposed deadline from Judge

7    McMahon.  I have to live with that just as you all have to live

8    with it.  But I don't see the difference between coming to

9    their office at 9:00 on Monday and coming to their office at

10   9:00 on Friday, something that I'm going to have to make them

11   snap to it an extra 24 hours in advance when they're sitting

12   here quite unhappy they're going to have to do this to begin

13   with.

14           MR. BEGG:  Thank you, your Honor.

15           THE COURT:  So that's the solution we'll arrive at

16   which is the review by Monday.  If you finish earlier let him

17   know, but I assume you won't but it should be available for his

18   review as of Monday morning and I do think you should submit an

19   order for me to sign that makes it clear exactly what's being

20   agreed to here, which is that it's an attorneys eyes only

21   review and any breach of that would be subject to contempt of

22   Court but it's without prejudice to Mr. Begg making any further

23   application he wants to make to the Court should there be

24   documents in his review that he believes are not privileged or

25   otherwise should be produced.  So you're going to have to have

1   a further meet and confer to that effect.  If there are

2   documents within this collection that he wants to see more of I

3   encourage you all to be reasonable to try to navigate that

4   because there may be documents he wants to utilize that may

5   have certain redactions, then Mr. Begg will have to decide

6   whether he can live with using them if they have certain

7   redactions.  It may not matter to person X.  That may matter to

8   Mr. McGorty and the IG but who it is may not matter.  It may

9   matter what the subject of it is.

10       So I ask you all to try and be practical because they

11   care I think about things somewhat differently I suspect than

12   you do.  You care about sort of core allegations and if it's

13   Joe Smith or Bob Jones it doesn't really matter what they're

14   saying, whereas it's important for the world not to know it's

15   Bob Jones or Bill Smith and that's what they care about.

16       So I expect there are probably going to be common

17   sense solutions even if there are documents in this collection

18   you want to use.  We'll take it one step at a time and after

19   you had your review and after you've had your meet and confer

20   you are without prejudice to reserving your right to make a

21   further application if you need to.

22       MR. BEGG:  Very good.  Thank you.

23       THE COURT:  All right?  And we'll put out an order to

24   this effect resolving the applications that are on the docket.

25       MR. BEGG:  Thank you.

F3BFMOOC

1          THE COURT:  Anything else?  Have a great day and can I

2     give you the box back?

3          MS. COSTELLO:  Yes.

4          THE COURT:  Have a good afternoon.

5          (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25